

IN THE

# Court of Appeals of Indiana



FILED

Apr 07 2026, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Gordon S. Nesbit Revocable Trust,

*Appellant / Plaintiff / Counterclaim Defendant*

v.

Robert Jason Hendrickson,

*Appellee / Defendant / Counterclaim Plaintiff*

April 7, 2026

Court of Appeals Case No.
25A-PL-2274

Appeal from the Monroe Circuit Court

The Honorable Geoffrey J. Bradley, Judge

Trial Court Cause No.
53C01-2308-PL-1863

**Opinion by Judge Bradford**

Judges Pyle and Kenworthy concur.

**Bradford, Judge.**

# Case Summary

[1] The Gordon S. Nesbit Revocable Trust ("the Trust") and Robert Jason Hendrickson ("Jason") own adjoining parcels of land in Monroe County. In 2023, a disagreement arose concerning the exact location of their shared property line, with the disputed area being a strip of land of approximately 3.22 acres ("the Disputed Area"). The Trust filed a complaint for criminal trespass, seeking declaratory judgment as to ownership of the Disputed Area, and seeking a permanent injunction against and damages from Jason. Jason filed a counterclaim to quiet title in the Disputed Area. After a bench trial, the trial court entered judgment in favor of Jason. The Trust contends that the trial court erred in finding (1) that Jason's proposed property line was the true property line and (2) that the parties had not acquiesced in the Trust's proposed property line in any event. Because we disagree, we affirm.

# Facts and Procedural History

## I. Background

[2] The Trust owns land at 3685 East Robinson Road in Monroe County, Indiana ("the Eastern Parcel"). The adjacent property to the west, at 3681 East Robinson Road ("the Western Parcel"), is owned by Jason. The Eastern and Western Parcels are located, respectively, in the northwest and northeast

quarters of Section 2, Township 9 North, Range 1 West ("Section 2"), in Monroe County.[1] This appeal concerns a dispute regarding the location of the property line shared by the Eastern and Western Parcels, illustrated by the map below, with the shaded area representing the area in dispute ("the Disputed Area"):



Exhibit J

---

[1] In the United States Public Land Survey System, land is generally divided into thirty-six-square-mile survey townships (identified in relation to a principal meridian and a baseline), which are then subdivided into thirty-six sections of one square mile or 640 acres each. *See* Purdue Extension, *Indiana Land Surveys: Their Development and Uses*, https://docs.lib.purdue.edu/agext/1077/ (last visited March 24, 2026).

Ex. Vol. I p. 191.  The Disputed Area of approximately 3.22 acres is seventy-one feet wide on the north boundary and thirty-six feet wide on the south boundary.

## II.      Facts

In 1838 and 1859, J.W. Spencer conducted a survey in or near Section 2 and established its northwest corner, as well as the northwest corner of the east half of the northwest quarter, *i.e.*, the Eastern Parcel.  In 1937, a Commissioner's Deed was issued to Robert Hendrickson, which transferred to him the land comprised of the Eastern and Western Parcels.  By 1974, the land transferred by the 1937 deed was owned by Ocie, Robert's widow.

On September 12, 1974, Ocie transferred the Western Parcel to her son Carl and his wife Alma Jean (Jason's grandparents) by warranty deed.  The deed provided that the following land was being transferred:

> East half of the Northwest quarter of Section Two (2), Township Nine (9) North, Range One (1) West.
>
> Subject to the fall installment of taxes due and payable in November, 1974, and all subsequent taxes thereto.
>
> Subject to the right of ingress and egress to other adjoining property along the existing road.
>
> Subject to survey.

Ex. Vol. I p. 170.

In January of 1975, Monroe County Surveyor Raymond Graham was commissioned to execute a survey and plat of the Eastern Parcel.  Graham's

survey was subsequently affirmed by two later surveys by him, one in December of 1975 and another in 1986. Graham's survey purported to identify the line between the northeast and northwest quarters of Section 2, which he marked with iron pipes on the north and south ends ("the Graham Line"). Graham's draft depiction did note, however, the presence of a partial fence or corral near a barn approximately seventy feet to the east of the Graham Line at the north boundary and approximately thirty-one feet to the east of the line at the south boundary. On October 17, 1978, Ocie transferred the Eastern Parcel to her son Walter Lee Hendrickson ("Jimmy") and his wife Donna via a warranty deed whose description of the parcel's west boundary reflected Graham's survey. At some point after Ocie had conveyed the Eastern Parcel to Jimmy, he put up a fence on the Graham Line. Despite the presence of Jimmy's fence, members of the extended Hendrickson family, in some ways at least, continued to treat the Eastern and Western Parcels as one property.

[6] On January 25, 2021, Jimmy's sons transferred the Eastern Parcel to the Trust, and the description of the parcel in the warranty deed again reflected Graham's survey. Sometime in 2023, a dispute arose between the Trust and Jason when Jason approached Gordon Nesbit and claimed that the existing fence originally installed by Jimmy was not on the property line, which he alleged was further to the east. Jason hired surveyor Eric Deckard to perform a retracement survey on the east half of the northwest quarter of Section 2. After Deckard reviewed the Graham survey and deed history for both parcels and conducted field work, he determined that the actual property line was approximately seventy-one feet

to the east of the Graham Line at the north boundary of Section 2 and approximately thirty-six feet to the east on the south boundary, an overlap area of approximately 3.22 acres.

[7] The Trust hired Gary Kent to review Deckard's survey, who determined that the Graham Line was the property line based on the principle of original survey. Kent concluded that the Graham survey had been the original survey, not only on the basis that it had been the first to properly establish the relevant quarter-section line, but also on the basis that it had represented the property line that had been identified when Ocie had deeded the Western Parcel to Carl and Alma Jean.

## III.    Procedural History

[8] On August 21, 2023, the Trust filed its complaint for declaratory judgment and trespass, seeking a permanent injunction against and damages from Jason. On October 16, 2023, Jason responded to the Trust's complaint and filed a counterclaim to quiet title in the Disputed Area on the basis that the Deckard Line was the true property line and that his and the Trust's predecessors-in-interest had treated the Disputed Area as though Jason's predecessors had owned it. On March 17, 2025, the Trust requested that the trial court issue findings of fact and conclusions thereon. On April 7 and 8, 2025, the trial court conducted a bench trial.

[9] On August 22, 2025, the trial court entered judgment in favor of Jason, finding, *inter alia*, that

[t]here is no evidence of an express agreement […] as to the
boundary line being the Graham Line. Rather, the evidence
established that since the time Ocie Hendrickson and Robert
Hendrickson owned the land until the Nesbit Trust Real Estate
was transferred to Nesbit Trust, it was used as if it was one piece
of land. Even after Ocie Hendrickson transferred the Hendrickson
Real Estate and the Nesbit Trust Real Estate to Jimmy
Hendrickson, the land was still used by the Hendrickson family as
if it was one property.

Order p. 12. The trial court also denied the Trust's criminal-trespass claim and found that the Deckard Line was the true property line, effectively awarding the Disputed Area to Jason.

## Discussion and Decision

The trial court entered findings of fact at the Trust's request. Under such circumstances,

> we determine whether the evidence supports the trial court's
> findings, and we determine whether the findings support the
> judgment. We will not disturb the trial court's findings or
> judgment unless they are clearly erroneous. Findings of fact are
> clearly erroneous when the record lacks any reasonable inference
> from the evidence to support them, and the trial court's judgment
> is clearly erroneous if it is unsupported by the findings and the
> conclusions which rely upon those findings. In determining
> whether the findings or judgment are clearly erroneous, we
> consider only the evidence favorable to the judgment and all
> reasonable inferences to be drawn therefrom. We will neither
> reweigh evidence nor judge the credibility of witnesses.

*Bussing v. Ind. Dep't of Transp.*, 779 N.E.2d 98, 102–03 (Ind. Ct. App. 2002) (citations omitted), *trans. denied*. "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must

leave it with the firm conviction that a mistake has been made." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997).

## I.  Acquiescence

[11]  The Trust contends that the trial court erred in failing to conclude that Jason and/or his predecessors-in-interest had acquiesced to the Trust's possession of the Disputed Area.  In order to establish acquiescence, the Trust was required to establish that

> two adjoining property owners (1) share a good-faith belief concerning the location of the common boundary line that separates their properties and, (2) although the agreed-upon location is not in fact the actual boundary, (3) use their properties as if that boundary was the actual boundary (4) for a period of at least twenty years.  It is the original agreement between the adjoining owners that takes this and all other "acquiescence" cases out of the realm of adverse possession.

*MLS Enters., LLC v. Norman*, 209 N.E.3d 30, 37 n.3 (Ind. Ct. App. 2023) (citation omitted).

[12]  An agreement between the parties supporting acquiescence does not have to be express, but it can be implied:

> The line agreement need not be express and may be inferred from the parties' actions, but there must be evidence of some agreement as to the boundary line.  Use and improvement of the land up to the alleged boundary line may be sufficient to satisfy the requirement of an agreement if the adjoining landowner acquiesces.

*Freiburger v. Fry*, 439 N.E.2d 169, 172 (Ind. Ct. App. 1982) (citation omitted).

[13]     At the very least, the Trust has failed to establish that the parties and their predecessors-in-interest had ever agreed that the Graham Line was the property line between the Eastern and Western Parcels before the sale of the Eastern Parcel to the Trust. It is undisputed that all of the predecessors-in-interest to both parties (as well as Jason) had been members of the extended Hendrickson family from 1974 until 2021, when the Eastern Parcel was sold to the Trust. Carl's son John lived on the Hendrickson property from 1960 until 1978. John testified that neither the transfer of the Eastern Parcel to his parents nor the installation of Jimmy's fence had affected where he or other family members had gone on either property. John also testified that Carl had kept horses "as long he [could] remember[,] who ran "the whole property" even after Jimmy's fence had been installed. Tr. Vol. I p. 116.

[14]     Jason, who was born in 1974, testified that he had owned the Western Parcel since 2006 and had never treated Jimmy's fence as though it represented the property line between the Eastern and Western Parcels. Jason testified that he had run cattle on the Western Parcel with Jimmy's approval and that all of the property at issue "was used and viewed as Hendrickson family property[,]" which had continued after the sale of the Eastern Parcel to Jimmy in 1978. Tr. Vol. I p. 172. The record supports the trial court's finding that the relevant persons had never acted as though the Western and Eastern Parcels were separate properties before the sale of the Western Parcel to the Trust.

## II. The Property Line

The finding that the parties have never treated the Graham Line as the true property line, while sufficient to fatally undercut the Trust's acquiescence claim, only takes us part of the way. The trial court's judgment in favor of Jason relies on the Deckard Line being the true property line, and we conclude that there is sufficient evidence to support such a finding. Deckard testified that he had performed a retracement survey of the relevant property, which is "retracing an original survey that was performed prior." Tr. Vol. I p. 198. In so doing, he had examined all of the deeds within the vicinity, located records of surveys in the area, and "head[ed] to the field" to search for trace evidence of monuments left in previous surveys. Tr. Vol. I p. 200.

As for the relevant deeds, a 1937 Commissioner's deed issued to Robert A. Hendrickson was admitted in which "the east half of the northwest quarter of section two (2), township nine (9) north, range one (1) west [and] part of the west half of the northeast quarter of said section, town[ship] and range" was transferred. Ex. Vol. I p. 83. The 1974 and all subsequent transfers of the Western Parcel transferred the "East half of the Northwest quarter of Section Two (2), Township Nine (9) North, Range One (1) West[,]" and none includes a carve-out for the Disputed Area, which extends into the east half of the northwest quarter of Section 2. Ex. Vol. I pp. 170, 172, 173, 174, 176, 178.

Moreover, the evidence of Deckard's field work confirmed that the line he identified is the true centerline of Section 2. First, the Deckard Line referred back to and incorporated the Spencer surveys of 1838 and 1859. While neither

of the Spencer surveys had marked the center point on the north boundary of Section 2, Deckard determined that both of Spencer's surveys agreed with respect to the north boundary of Section 2. Deckard located a stone marking the northwest corner of the east half of the northwest quarter of Section 2 (*i.e.*, one quarter of the way across Section 2 across the north boundary from the west boundary), believed to have been set by Spencer in 1859 and mentioned in contemporaneous records of the Monroe County Surveyor. Deckard also located the nail in Old State Road 37 marking the northwest corner of Section 2 and measured east from that corner along the north boundary of Section 2. Deckard found that the distance from the nail to the stone was approximately seventy feet longer than the distance from the stone to the monument Graham had placed at the supposed centerline of Section 2, when the two distances should have been the same. Once Deckard had located the true center of the north boundary of Section 2, he drew a straight line to another existing monument at the center of Section 2 on the south boundary, thereby marking the centerline of Section 2.

[18] Further evidence is provided by the fact that, in Graham's 1975 survey, he had noted evidence of a fence approximately seventy feet to the east of the Graham Line at the north boundary of Section 2, which Deckard determined "agree[d] with the aliquot[2] breakdown of the section." Tr. Vol. I p. 211. Although

---

2 To aliquot a piece of land is to "divide […] into equal parts[,]" which in this case meant dividing Section 2 into equal western and eastern halves by locating the north-south centerline. WEBSTER'S 3D NEW INT'L DICTIONARY 53 (Phillip Babcock Gove et al. eds., G.&C. Merriam Company 1993).

fences do not by any means always mark a property line, they frequently do, lending further support to Deckard's conclusion regarding the location of the centerline of Section 2.

[19] Regarding Graham's surveys, Deckard concluded that, while Graham had apparently been attempting a retracement survey, he had not followed the minimum standards for such a survey. While Deckard had located relevant monuments and other trace evidence, Deckard found no evidence that Graham had done the same. Moreover, Graham had noted the existing fence but had included it in his final survey drawing, as he, apparently, had not considered it as evidence of the centerline of Section 2. In summary, Deckard opined that the line he identified as the centerline of Section 2 was the actual centerline according to "original survey doctrine[.]" Tr. Vol. I p. 214.

[20] The Trust argues that the provision in the 1974 deed that the transfer of the Western Parcel to Carl and Alma Jean was "subject to survey" somehow validates Graham's 1975 survey of the Eastern Parcel and that Graham's survey was original and therefore has precedence over the Deckard Line in any event. Both of these arguments are undercut by the fact that Graham's survey was of the Eastern Parcel, and it seems that no survey specifically of the Western Parcel was completed until Deckard surveyed it in 2023. In the end, the 1974 deed transferred the entirety of the east half of the northwest quarter of Section 2 to Carl and Alma Jean, which means that Ocie's later transfer of part of that half to Jimmy was an attempt to transfer land that she no longer owned. It is an "ancient maxim that a grantor cannot convey that which he does not own.

[…] If a grantor conveys property, part of which belongs to the grantor and part of which belongs to another, the deed is good as to the property owned by the grantor and a mere nullity as to the property not owned by the grantor." *Downing v. Eubanks*, 557 N.E.2d 1029–30 (Ind. Ct. App. 1990) (citation and quotation marks omitted).

[21] We affirm the judgment of the trial court.

Pyle, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Larry D. Allen
Paganelli Law Group
Bloomington, Indiana

ATTORNEY FOR APPELLEE

Christine L. Bartlett
Ferguson Law
Bloomington, Indiana